NO. COA13-615

NORTH CAROLINA COURT OF APPEALS

Filed: 7 January 2014

NORTH CAROLINA FARM BUREAU MUTUAL
INSURANCE COMPANY, INC.,
    Plaintiff-Appellee,

v.
                                Wake County
                                No. 12 CVS 7710

WADE H. PASCHAL, JR., Guardian Ad
Litem for Harley Jessup; REGGIE
JESSUP; RANDALL COLLINS JESSUP;
and THURMAN JESSUP,
    Defendants-Appellants.


Appeal by Defendants from orders entered 30 November 2012 and 6 December 2012 by Judge G. Wayne Abernathy in Superior Court, Wake County. Heard in the Court of Appeals 22 October 2013.

> *Haywood, Denny & Miller, L.L.P., by Robert E. Levin, for Plaintiff-Appellee.*

> *Moody, Williams, Roper & Lee, LLP, by C. Todd Roper, for Defendants-Appellants.*


McGEE, Judge.


Sixteen-year-old Harley Jessup ("Harley") was injured on 15 April 2009 when a truck driven by her cousin, Randall Collins Jessup ("Randall"), ran off the road and into a ditch, causing Harley to be ejected from the truck. Harley, through her guardian *ad litem* Wade H. Paschal, Jr. ("Paschal"), and Harley's father,

Reggie Jessup ("Reggie"), filed a complaint on 28 March 2012, alleging injury from the accident and medical expenses of $81,087.44. Randall's automobile insurance carrier tendered the $30,000.00 amount of its coverage. The 28 March 2012 complaint also included an underinsured motorist claim against an automobile policy ("the policy") of Harley's paternal grandfather, Thurman Jessup ("Thurman"), which was issued by North Carolina Farm Bureau Mutual Insurance Company, Inc. ("Plaintiff").

Plaintiff initiated the present action by filing a complaint for declaratory judgment on 25 May 2012. Paschal, as guardian *ad litem* for Harley, along with Reggie, Randall, and Thurman were all named defendants. In Plaintiff's complaint, Plaintiff asked the trial court to rule that Harley was not covered by the policy. Plaintiff moved for summary judgment on 4 October 2012. Harley, through Paschal, along with Reggie, Randall, and Thurman, moved on 30 October 2012 to change venue from Wake County to either Chatham County or Randolph County. The motion for change of venue was denied by order filed 30 November 2012. In an order filed 6 December 2012, the trial court concluded that Harley was "not a resident of [Thurman's] household on April 15, 2009, and [was] therefore not entitled to coverage under the policy[.]" Based upon this conclusion, the trial court granted summary judgment in favor of Plaintiff. Paschal, as guardian *ad litem* for Harley, and

Reggie and Thurman ("Defendants") appeal from the 30 October 2012 and the 6 December 2012 orders. Defendant Randall Collins Jessup is not a party to this appeal.

At the time of the accident, Thurman owned multiple houses and several hundred acres of farmland. Thurman and Reggie had owned a house together until the house burned in 2005. Harley lived with Reggie in that house for a short period after she was born. Thurman purchased a house at 6846 Brush Creek Road. ("Brush Creek house") in 1983, and lived there until sometime in the early 2000s. Thurman also purchased a house at 6615 Joe Branson Road ("Branson house") in 1997. The Branson house was approximately one mile from the Brush Creek house, and a person could walk from the Branson house to the Brush Creek house without leaving Thurman's property. Reggie and his children, including Harley, moved into the Branson house shortly after Thurman purchased it. In 2002, Thurman purchased a fifty percent interest in a house owned by his girlfriend, Donna Whitehead ("Ms. Whitehead"), located at 398 Browns Crossroads ("Browns Crossroads house"). After purchasing an interest in the Browns Crossroads house, Thurman spent most of his nights sleeping at either the Browns Crossroads house or the Brush Creek house. On rare occasions, Thurman would sleep at the Branson house.

Most of Thurman's mail, including bank statements, was sent to the Brush Creek house, and that is the address Thurman used for most official business, such as his tax returns and voter registration. The Brush Creek house was also where Thurman kept most of his clothing.

At his deposition, Thurman testified he owned over 100 head of cattle, approximately 4,000 hogs, and about 32,000 chickens, which were housed in different areas around his farm, including the Branson house, the Brush Creek house, and surrounding land. Thurman considered his farm to be a "family farm," and several relatives lived and work on the farm. Reggie lived in the Branson house with Harley and her brothers. Harley had lived primarily at that address since she was a very young child. Thurman paid all the bills associated with the Branson house. Those bills were sent to Thurman's Brush Creek house. Reggie did not pay anything to live in the Branson house. Thurman even paid for Reggie's phone service.

For many years, Thurman had taken continued responsibility for multiple family members, and some people not related to him by blood or marriage. For example, at the time of his deposition, Thurman had two children, not related to either him or Ms. Whitehead, living with him. Thurman had taken the two children in nine years earlier because the children's father was often out of

the state for work. When the children's father was in town, Thurman allowed him to stay in one of Thurman's houses free of charge. Ms. Whitehead's daughter and her two children also lived with Thurman and Ms. Whitehead. Harley and her brothers also lived with Thurman at times. Reggie had ongoing trouble with the law, and spent time in jail or prison on occasion. When Harley could not stay with Reggie due to Reggie's legal problems, she stayed with Thurman, at both the Browns Crossroads house and at the Brush Creek house. Around 2005, Harley spent a year living with Thurman because of Reggie's legal troubles. Thurman was appointed as Harley's guardian for that period of time. Harley's mother was not very involved in Harley's life, and did not appear to provide Harley with material assistance or much guidance.

Thurman testified he supported Harley through "every bit" of her life, providing food, clothes, housing, utilities, phone, and other expenses. Reggie drove a truck that belonged to Thurman and if something was needed for the Branson house, such as a washing machine, Thurman bought it. Thurman testified that when Harley was not living with him, he saw her two or three times a week. Harley testified she saw Thurman almost every day. Thurman had keys to all his houses, and felt free to enter them at any time. If Harley needed to go to the doctor or dentist, Thurman took her.

When questioned at his deposition, Thurman agreed that Reggie, Harley, and her brothers were all a part of his household.

Plaintiff filed its complaint for declaratory judgment on 25 May 2012 and requested that the trial court "declare whether [Plaintiff's] UIM policy issued to Defendant Thurman Jessup [was] applicable to the claim of Harley Jessup."  Harley, through Paschal, and Reggie, answered Plaintiff's complaint on 3 August 2012, and counterclaimed, asking that the trial court "declare the UIM policy issued to defendant Thurman Jessup applicable to the claims of Harley and Reggie arising from the accident on or about April 15, 2009."  Plaintiff filed a motion for summary judgment on 4 October 2012.  Defendants filed a motion on 30 October 2012 to change venue from Wake County to either Chatham County or Randolph County.  The trial court denied Defendants' motion to change venue by order filed 30 November 2012.  In an order entered 6 December 2012, the trial court granted Plaintiff's motion for summary judgment, ruling that Harley "was not a resident of the Defendant Thurman Jessup's household on April 15, 2009, and [was] therefore not entitled to coverage under the policy of UIM insurance issued by the Plaintiff to Defendant Thurman Jessup[.]"  Defendants appeal.

I.

The issues in this appeal are whether (1) the trial court erred in denying Defendants' motion to change venue and (2) the trial court erred in granting summary judgment in favor of Plaintiff by ruling that Harley was not a resident of Thurman's household. We affirm in part and reverse and remand in part.

II.

Defendants acknowledge that Wake County was a proper venue for this action. However, Defendants argue the trial court abused its discretion by not changing venue to either Chatham County or Randolph County "for the convenience of witnesses and the promotion of justice." We disagree.

The trial court is given broad discretion when ruling on a motion to change venue for the convenience of witnesses:

> "'[T]he trial court may change the place of trial . . . [w]hen the convenience of witnesses and the ends of justice would be promoted by the change.'" However, the court's refusal to do so will not be disturbed absent a showing that the court abused its discretion. The trial court does not manifestly abuse its discretion in refusing to change the venue for trial of an action pursuant to subdivision (2) of [N.C. Gen. Stat. § 1-83] unless it appears from the matters and things in evidence before the trial court that the ends of justice will not merely be promoted by, but in addition demand, the change of venue, or that failure to grant the change of venue will deny the movant a fair trial.
>
> . . . .

> In resolving this issue here, we do not set forth a "bright line" rule or test for determination of whether a trial court has abused its discretion in denying a motion to change venue. Rather, the determination of whether a trial court has abused its discretion is a case-by-case determination based on the totality of facts and circumstances in each case.

*United Services Automobile Assn. v. Simpson*, 126 N.C. App. 393, 399-400, 485 S.E.2d 337, 341 (1997) (citations omitted). Defendants fail to demonstrate that the trial court's discretionary ruling denying their motion to change venue denied them a fair trial, or that the ends of justice demanded a change of venue. Defendants simply argue that "it [was] more convenient for [Defendants] to litigate this action in either Randolph or Chatham County rather than Wake County." According to Defendants' motion to change venue, "Plaintiff's principal office is in Wake County, North Carolina and it conducts business in said county." Chatham County borders Wake County, and the courthouses in these two counties are not separated by great distances.

Though Randolph or Chatham County may be a more convenient forum for Defendants, Wake County appears to be a more convenient forum for Plaintiff, and we find no abuse of discretion in the trial court's order denying Defendants' motion to change venue from Wake County. This argument is without merit.

III.

Defendants argue the trial court erred in granting summary judgment in favor of Plaintiff because Harley was covered under the policy.  We agree.

Although this is an action for declaratory judgment, because it was decided by summary judgment, we apply the standard of review applicable to summary judgment.

> Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "any party is entitled to a judgment as a matter of law."  In ruling on a motion for summary judgment, "the court may consider the pleadings, depositions, admissions, affidavits, answers to interrogatories, oral testimony and documentary materials."  All such evidence must be considered in a light most favorable to the non-moving party.  On appeal, an order allowing summary judgment is reviewed *de novo*.

*Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470, 597 S.E.2d 674, 693 (2004) (citations omitted).

This Court reviews a grant of summary judgment *de novo*, and should affirm the trial court's action if our *de novo* review uncovers any basis to support the grant of summary judgment.  We agree with the trial court that the dispositive issue is whether the policy issued by Plaintiff covers Harley as a "family member" as that term is defined in the policy.[1]  "Part C1" of the policy: "Uninsured Motorists Coverage," states in relevant part:

---

[1] Plaintiff and Defendants argue about whether Thurman could be considered a resident of 6615 Joe Branson Road.  Determination of

We will pay compensatory damages which an **insured** is legally entitled to recover from the owner or operator of an **uninsured motor vehicle** because of:

1. Bodily injury **sustained by an** insured **and caused by an accident; and**

2. **Property damage** caused by an accident.

The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the **uninsured motor vehicle**.

. . . .

**"Insured"** as used in this Part means:

1. You [the named insured] or any **family member**. [(Emphasis in original)].

The policy includes the following definition of "family member:"

**"Family member"** means a person related to [the named insured] by blood, marriage or adoption who is a resident of [the named insured's] household. This includes a ward or foster child. [(Emphasis in original)].

Resolution of the matter before us depends on whether Harley was "a resident of [Thurman's] household" under the policy. The policy does not define the words "resident" or "household." It is undisputed that Harley is related to Thurman Jessup by blood, and that she lived at 6615 Joe Branson Road at the time of the accident. The determination of whether Harley was also a resident of

the place or places where Thurman resided, however, is only relevant to the extent, if any, that it can assist in determining what constituted Thurman's "household."

Thurman's household, however, is more complicated. The word "resident" is "flexible, elastic, slippery and somewhat ambiguous[,]" meaning anything from "a place of abode for more than a temporary period of time" to "a permanent and established home[.]" *Great American Ins. Co. v. Allstate Ins. Co.*, 78 N.C. App. 653, 656, 338 S.E.2d 145, 147 (1986) (citations and quotation marks omitted). This Court has held that when a term,

> if not defined, is capable of more than one definition [it] is to be construed in favor of coverage. . . . . "When an insurance company, in drafting its policy of insurance, uses a 'slippery' word to mark out and designate those who are insured by the policy, it is not the function of the court to sprinkle sand upon the ice by strict construction of the term. All who may, by any reasonable construction of the word, be included within the coverage afforded by the policy should be given its protection. If, in the application of this principle of construction, the limits of coverage slide across the slippery area and the company falls into a coverage somewhat more extensive than it contemplated, the fault lies in its own selection of the words by which it chose to be bound."

*Fonvielle v. Insurance Co.*, 36 N.C. App. 495, 497-98, 244 S.E.2d 736, 738 (1978) (citations omitted).

Determinations of whether a particular person is a resident of the household of a named insured are individualized and fact-specific:

> Cases interpreting the phrase, "residents of the same household," as used in insurance policies, are legion. These cases can be

divided into two categories: those involving clauses that exclude from coverage members of the insured's household, and those that extend coverage to such persons. Applying the general rule that coverage should be provided wherever, by reasonable construction, it can be, courts have restrictively defined "household" in those cases where members of the insured's household are excluded from coverage. On the other hand, where members of an insured's household are provided coverage under the policy, "household" has been broadly interpreted, and *members of a family need not actually reside under a common roof to be deemed part of the same household*. As pointed out by this court in *Fonvielle v. Insurance Co.*, . . . construction of such terms as "resident" and "household" in favor of coverage may lead to "the seemingly anomalous result" of a very narrow definition under one set of circumstances and a very broad definition under another.

*Davis v. Maryland Casualty Co.*, 76 N.C. App. 102, 105, 331 S.E.2d 744, 746 (1985) (citations omitted) (emphasis added). Not only are relevant facts considered in making this determination, but intent, as well:

As observed by our courts, the words "resident," "residence" and "residing" have no precise, technical and fixed meaning applicable to all cases. "Residence" has many shades of meaning, from mere temporary presence to the most permanent abode. It is difficult to give an exact or even satisfactory definition of the term "resident," as the term is flexible, elastic, slippery and somewhat ambiguous. Definitions of "residence" include "a place of abode for more than a temporary period of time" and "a permanent and established home" and the definitions range between these two extremes. This being the case, our courts have held that

> such terms should be given the broadest construction and that all who may be included, by any reasonable construction of such terms, within the coverage of an insurance policy using such terms, should be given its protection.
>
> Our courts have also found . . . that in determining whether a person in a particular case is a resident of a particular household, the intent of that person is material to the question.

*Great American*, 78 N.C. App. at 656, 338 S.E.2d at 147 (citations omitted).  A minor may be a resident of more than one household for the purposes of insurance coverage.  *Davis*, 76 N.C. App. at 106, 331 S.E.2d at 746 (citation omitted).

We find the particular factual situations in *Davis* and *Great American* instructive for our analysis.  In *Davis*, this Court held:

> Applying these general principles to the case *sub judice*, we believe that the minor plaintiff was as much a resident of her insured father's household as that of her mother.  While the father maintained a separate residence from that of the mother, the evidence discloses that there existed between the father and the minor plaintiff a continuing and substantially integrated family relationship.  We therefore hold that the trial court correctly concluded that the minor plaintiff . . . was a resident of her insured father's household within the meaning of the insurance policy, and is entitled to coverage thereunder.

*Davis*, 76 N.C. App. at 106, 331 S.E.2d at 747 (citations omitted).  The following facts were considered by this Court in *Great*

*American*, where the issue was whether the defendant was a resident

of his parents' household for insurance purposes:

> The forecast of evidence before the trial court showed that at the time of the collision, Sean Wale [the defendant] was an emancipated person who was enlisted in the United States Navy and stationed at Norfolk, Virginia. He enlisted in November of 1979. At the time he enlisted he gave his parents' home address in Salisbury as his home address. During his enlistment, he had no housing other than his military station. Also, during his enlistment, he visited his parents from time to time and, just prior to the April collision, he had completed a 14-day convalescent leave spent at his parents' home and was returning to his base in Norfolk. At the time of the collision, Sean gave the investigating highway patrolman a home address the same as his parents' home address in Salisbury. In June 1982, when asked by an insurance adjuster where he was, Sean answered, "At home," giving his parents' address. After he got out of the service in August of 1982, Sean stayed with his parents for several weeks while he looked for a place to live.

> When Sean left to join the Navy, he removed all of his personal belongings from his parents' home. When he visited his parents on leave, he slept on a living room couch and had no bed or dresser of his own. When he enlisted in the Navy, he never intended to return to his parents' home. He did not consider himself to be a resident of his parents' household at the time of the collision. Sean's parents did not consider Sean to be a resident of their household at the time of the collision.

> . . . .

> The forecast of evidence before the trial

court raises a question as to Sean Wale's intent to remain a resident of his parents' household or to assume that status from time to time. Sean's habit of returning to his parents' home for furloughs and leaves and his returning there after discharge from the Navy tends to show an intent to make his parents' home his own. On the other hand, the forecast is complicated by Sean's own statement that he did not intend to return to that residence after his enlistment; this statement tends to show an opposite intent from that shown by his habits and activities. Thus, a material issue of fact has been raised which must be determined by the finder of fact.

*Great American*, 78 N.C. App. at 655, 656-57, 338 S.E.2d at 146-47 (citations omitted).

In the present case, evidence before the trial court, considered in the light most favorable to Defendants, tends to show that Thurman was the most constant caregiver in Harley's life. Thurman owned the Branson house where Harley was living at the time of the accident. Thurman did not charge any rent for Reggie, Harley, or her brothers to live there. Thurman had a key to the Branson house, and freely entered it whenever he desired. Thurman paid the utility bills for the Branson house, and bought appliances for the house as needed. The Branson house and the Brush Creek house were connected to each other by contiguous land owned by Thurman. Thurman considered these two houses to be part of his farm, which he considered to be a family farm. To this extent, Harley and Thurman could both be considered residents of Thurman's

"family farm." Thurman spent much of his time at the Brush Creek house, and had most of his mail, including important documents, delivered to that address.

Though Thurman apparently did not spend many nights at the Branson house, he did see Harley most every day of the week, and he was a regular participant in Harley's life. Thurman was often the one who took Harley to the dentist or doctor. Thurman paid for the vast majority of Harley's expenses, including necessaries such as food and clothing, as well as lifestyle items, such as Harley's prom dress. In addition, when Harley did not have a parent with whom to live because her father was either in prison or otherwise prohibited from living with Harley, and her mother either could not or would not provide housing and support, Harley lived with Thurman. On these occasions, Thurman handled every responsibility, including helping Harley with her schoolwork and taking her to school. For a period of time when Reggie was incarcerated, Thurman was appointed legal guardian of Harley. A few years before the accident, Harley lived with Thurman for a year due to Reggie's legal troubles.

Finally, in the present case, unlike in *Great American*, both Harley and Thurman considered Harley to be a part of Thurman's household. When we consider all the relevant facts, we hold, in light of the very particular circumstances in this case, that

Harley was a resident of Thurman's household as defined under the policy at the time of the accident.  We reverse the 6 December 2012 order granting summary judgment in favor of Plaintiff and remand for entry of an order declaring that, at the time of the accident, Harley was a "family member," and thus an "insured," pursuant to the UIM policy issued by Plaintiff to Thurman.

Affirmed in part, reversed and remanded in part.

Judges BRYANT and STROUD concur.