IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA18-328

Filed: 3 September 2019

Currituck County, No. 16CVS151

NORTH CAROLINA FARM BUREAU MUTUAL INSURANCE COMPANY, INC.,
Plaintiff,

v.

MARINA MARTIN, by and through her natural parent and guardian JEAN O.
MARTIN, JEAN O. MARTIN, Individually, and DAVID M. MARTIN, Defendants.

Appeal by defendants from order entered 28 September 2017 by Judge J.
Carlton Cole in Currituck County Superior Court. Heard in the Court of Appeals 20
September 2018.

*Young Moore & Henderson, P.A., by Glenn C. Raynor, for plaintiff-appellee.*

*Breit Drescher Imprevento, P.C., by Jeffrey A. Breit, for defendants-appellants.*

BERGER, Judge.

Marina Martin ("Marina") by and through her parents, Jean ("Jean") and
David Martin ("David"), (collectively, "the Martins"), and Jean, individually appeal
the trial court's grant of summary judgment for North Carolina Farm Bureau Mutual
Insurance Company, Inc. ("Farm Bureau"). We affirm the trial court's judgment.

Factual and Procedural Background

On January 6, 2014, Jean operated a 1994 Ford vehicle in Virginia Beach, Virginia. Marina was a passenger in the vehicle. This vehicle was owned by David and Jean with a separate and independent policy of insurance issued in their names. Jean attempted to cross a four-way intersection when another vehicle driven by Santiago T. Livara, Jr., ("Livara") struck the 1994 Ford driven by Jean. Jean and Marina were both injured in the accident. Jean and Marina subsequently sued Livara in Virginia, alleging negligence.

Both Jean and Marina asserted that they were covered under the uninsured/underinsured motorist ("UM/UIM") provisions of a separate automobile insurance policy issued by Farm Bureau solely to Mary Martin ("Mary"). Mary is Jean's mother-in-law and Marina's paternal grandmother. Mary's policy was in effect on the date of the accident and provided medical coverage and UM/UIM coverage. The policy issued to Mary named only Mary as an owner-insured, and did not identify the 1994 Ford as a covered vehicle.

The Farm Bureau policy issued to Mary provides, in relevant part:

> PART B—MEDICAL PAYMENTS COVERAGE
>
> INSURING AGREEMENT
>
> We will pay reasonable expenses incurred for necessary medical and funeral services because of bodily injury:
> 1.    Caused by accident; and
> 2.    Sustained by an Insured
> . . . .

> "Insured" as used in this Part means:
> 　　1. You or any family member;
> 　　　a. while occupying; or
> 　　　b. as a pedestrian when struck by;
> 　　　a motor vehicle designed for use mainly on public
> 　　　roads or a trailer of any type.

Under Mary's policy, an "Insured", and consequently coverage, is limited to "You [Mary] or *any family member*, which is defined as "a person related to you by blood, marriage or adoption who is a resident of your household." The policy does not define either of the terms "resident" or "household."

On the date of the accident, Mary was the sole owner of a farm located on Knotts Island, North Carolina ("Martin Farm"). Mary lived alone on Martin Farm Lane, and her mailing address was registered to a Post Office Box in Knotts Island, North Carolina. The Martins lived in a separate and detached house located on the Martin Farm with an address on Bay Orchard Lane. Their mailing address was registered to a different Post Office Box in Knotts Island, North Carolina. The houses share a single driveway, but are both stand-alone houses and located approximately a three to five minute walk from one another. No evidence in the record tends to show either Marina or Jean ever lived with Mary in her residence on Martin Farm Lane.

Mary and the Martins saw each other almost every day and considered themselves to be a cohesive family unit. The Martins had keys to Mary's house with unlimited access, and Mary had the same access to the Martin's home. Barring

unforeseen circumstances or occasional overnight stays, the Martins and Mary lived separately in their respective houses.

Farm Bureau brought a declaratory judgment action alleging that Jean and Marina did not qualify as "insured[s]" as defined in the policy because they were not "residents" of Mary's "household" at the time of the accident. Farm Bureau and the Martins filed cross-motions from summary judgment and the trial court heard their motions on August 21, 2017. The Martins contended that Marina and Jean are entitled to coverage under Mary's policy because they are her "family member[s]," as defined therein. On September 28, 2017, the trial court granted summary judgment in favor of Farm Bureau and denied the Martins' motion for summary judgment.

The Martins timely appealed, arguing that the trial court erred by entering summary judgment in favor of Farm Bureau and concluding that Marina and Jean were not covered under Mary's policy. We affirm.

Standard of Review

"Although this is an action for declaratory judgment, because it was decided by summary judgment, we apply the standard of review applicable to summary judgment." *Farm Bureau Mut. Ins. Co. v. Paschal*, 231 N.C. App. 558, 563, 752 S.E.2d 775, 779 (2014).

> Summary judgment is appropriate where there is no genuine issue as to any material fact and any party is entitled to a judgment as a matter of law. In ruling on a motion for summary judgment, the court may consider the

> pleadings, depositions, admissions, affidavits, answers to interrogatories, oral testimony and documentary materials. All such evidence must be considered in a light most favorable to the non-moving party. On appeal, an order allowing summary judgment is reviewed *de novo*.

*Id.* (citation and quotation marks omitted).

"A party seeking benefits under an insurance contract has the burden of showing coverage." *Integon Nat'l Ins. Co. v. Villafranco*, 228 N.C. App. 390, 393, 745 S.E.2d 922, 925 (2013) (citation omitted). The judgment appealed from is presumed to be correct. *London v. London,* 271 N.C. 568, 571, 157 S.E.2d 90, 92 (1967). As appellants, Defendants carry the burden to show, not only that error occurred, but prejudicial and reversible error exists to overturn the trial court's judgment. "[T]he burden is upon appellant to show prejudicial error." *Id.* at 570, 157 S.E.2d at 92.

"The meaning of language used in an insurance policy is a question of law for this Court, as is the construction and application of the policy's provisions to the undisputed facts. As with any other question of law, our review is de novo." *Bruton v. N.C. Farm Bureau Mut. Ins. Co.*, 127 N.C. App. 496, 498, 490 S.E.2d 600, 601 (1997) (citations omitted).

## Analysis

On appeal, Marina and Jean argue that they are "insureds" under the policy and thus entitled to coverage because they are related to Mary by blood or marriage and are residents of Mary's Household. The material facts of this case are not disputed and both parties agree that Marina and Jean are related to Mary. Thus,

the sole issue on appeal is whether Marina and Jean were "residents" of Mary's

"household" under the policy on the date the accident occurred.

> As with all contracts, the object of construing an insurance policy is to arrive at the insurance coverage intended by the parties when the policy was issued. If the parties have defined a term in the agreement, then we must ascribe to the term the meaning the parties intended. We supply undefined, nontechnical words . . . a meaning consistent with the sense in which they are used in ordinary speech, unless the context clearly requires otherwise. We construe all clauses of an insurance policy together, if possible, so as to bring them into harmony. We deem all words to have been put into the policy for a purpose, and we will give effect to each word if we can do so by any reasonable construction.
>
> . . . .
>
> However, we only apply the preceding rules of construction when a provision in an insurance agreement is ambiguous. To be ambiguous, the language of an insurance policy provision must, in the opinion of the court, be fairly and reasonably susceptible to either of the constructions for which the parties contend. *If the language is not fairly and reasonably susceptible to multiple constructions, then we must enforce the contract as the parties have made it and may not, under the guise of interpreting an ambiguous provision, remake the contract and impose liability upon the company which it did not assume and for which the policyholder did not pay.*

*Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, LLC.*, 364 N.C. 1, 9-10, 692 S.E.2d

605, 612 (2010) (emphasis added) (*purgandum*). The Supreme Court of North

Carolina has also warned against result-orientated outcomes, instructing that "if a

policy is not ambiguous, then the court must enforce the policy as written and may

not remake the policy under the guise of interpreting an ambiguous provision." *Nationwide Mut. Ins. Co. v. Mabe*, 342 N.C. 482, 492, 467 S.E.2d 34, 40 (1996) (citations omitted).

"The interpretation of the terms 'resident of your household' or 'resident of the same household' or similar terms in insurance policies has been the subject of numerous appellate court decisions." *Great Am. Ins. Co. v. Allstate Ins. Co.*, 78 N.C. App. 653, 655-56, 333 S.E.2d 145, 147 (1986) (citations omitted). We will address each term herein.

I. "Resident"

We first address whether the term "resident," as used in Mary's Farm Bureau policy before us, has a plain and ordinary meaning or whether it is ambiguous. Past decisions of this Court have failed to answer this question consistently.

> As observed by our courts, the words "resident," "residence" and "residing" have no precise, technical and fixed meaning applicable to all cases. . . . It is difficult to give an exact or even satisfactory definition of the term "resident," as the term is flexible, elastic, slippery and somewhat ambiguous.

*Id.* at 656, 333 S.E.2d at 147 (citations omitted). Further, "a person may be a resident of more than one household for insurance purposes." *Davis v. Md. Cas. Co.*, 76 N.C. App. 102, 106, 331 S.E.2d 744, 746 (1985) (citation omitted). This Court has previously determined the word "resident" to be ambiguous and then construed it in a manner to conclude that the would-be insured was a member of the policy holder's

household. *See, e.g.*, *Paschal*, 231 N.C. App. at 568, 752 S.E.2d at 781-82; *Davis*, 76 N.C. App. at 104-06, 331 S.E.2d at 745-47; *Fonvielle v. S.C. Ins. Co.*, 36 N.C. App. 495, 497, 244 S.E.2d 736, 738 (1978).

However, this Court has clarified that "the term 'resident,' when used in an insurance policy and not defined by that policy, although subject to several different meanings, does not automatically result in coverage but instead is subject to its most inclusive definition." *Monin v. Peerless Inc.*, 159 N.C. App. 334, 341, 583 S.E.2d 393, 398 (2003) (citations omitted). In addition, the "[d]eterminations of whether a particular person is a resident of the household of a named insured are individualized and fact-specific . . . ." *Paschal*, 231 N.C. App. at 565, 752 S.E.2d at 780. Further, "the intent of that person is material to the question" of residency as well. *Great Am.*, 78 N.C. App. at 656, 338 S.E.2d at 147 (citation omitted); *see also Fonvielle*, 36 N.C. App. at 498, 244 S.E.2d at 738 ("Intent to remain at a place seems determinative, although not intent to remain permanently.").

Notwithstanding these gerrymandered and stretched interpretations, there are defined and rational limits, like a snapped rubber band, to the asserted notions of "flexible, elastic, [and] slippery" meanings of the term "resident." *Great Am.*, 78 N.C. App. at 656, 338 S.E.2d at 147. Its meaning can fall anywhere within the spectrum of "a place of abode for more than a temporary period of time" to "a permanent and established home . . . ." *Id.*

Here, the plain language of Mary's policy restricts and limits coverage thereunder to Mary and her "family member[s]," which are unambiguously defined by the policy as someone who is "related to [Mary] by blood, marriage or adoption *who is a resident* of [Mary's] household." (Emphasis added). The uncontroverted facts establish that neither Jean nor Marina had ever lived in Mary's house, and were not living in Mary's home on the date of the accident. It is impossible to invent a scenario to show individuals had established the intent to remain at a residence where neither ever lived.

Viewed in the light most favorable to the Defendants, Mary's home was never Jean nor Marina's "place of abode for more than a temporary period of time" or their "permanent and established home . . . ." *Id.* Even under the broadest interpretation of the term "resident", neither Jean nor Marina can demonstrate they meet the definition of "insureds" under the Farm Bureau policy issued to and owned by Mary.

II. "Household"

The Martins also argue that the term "household" should be broadly interpreted to find that Marina and Jean were residents of Mary's household. They assert because they lived in the separate house located upon Mary's family farm at the time of the accident, they are entitled to coverage. We disagree.

An insurance policy is "subject to judicial construction only where the language used in the policy is ambiguous and reasonably susceptible to more than one

interpretation." *Allstate Ins. Co. v. Chatterton*, 135 N.C. App. 92, 94, 518 S.E.2d 814, 816 (1999) (citation omitted). "[I]n construing the ordinary meaning of a disputed term, it is appropriate to consult a standard dictionary." *Id.* at 95, 518 S.E.2d at 817 (citation omitted).

Webster's New World College Dictionary defines household as "the person or *persons who live in one house*, apartment, etc." WEBSTER'S NEW WORLD DICTIONARY (5th ed. 2014). The American Heritage Dictionary also defines household as "[a] person or *group of people occupying a single dwelling*." THE AMERICAN HERITAGE DICTIONARY (5th ed. 2019). Black's Law Dictionary defines "household" as "[a] *group of people who dwell under the same roof*." BLACK'S LAW DICTIONARY (10th ed. 2014).(emphasis added). Each of these definitions restrict a household to require a single structure.

Here, the meaning of the term "household" is plainly understood and not ambiguous in "the sense in which [it is] used in ordinary speech." *Buzz Off Insect Shield, L.L.C.,* 364 N.C. at 9, 692 S.E.2d at 612. It is not "fairly and reasonably susceptible to either of the constructions for which the parties contend." *Id.* at 10, 692 S.E.2d at 612 (citation omitted).

The Martins encourage us to gerrymander and torture the meaning of the term "household" to encompass multiple structures located on the same tract of land. We decline to do so. Words have specific meanings and the above definitions consistently

and unambiguously demonstrate the plain meaning of the term "household" is limited to a single structure.

Here, the undisputed facts show the Martins lived in and occupied a separate house with a separate address and utilities, while Mary lived at a different address in her own house. The houses where Mary and the Martins resided were wholly independent structures with different addresses. Although both structures were located on the same tract of land, the Martins and Mary did not occupy the same "household" pursuant to the plain and ordinary meaning of that term in Mary's policy. By definition, multiple and distinct houses, are not "one house", a "single dwelling" or the "same roof", and cannot be defined as a "household". Defendants' arguments are overruled.

III. *Farm Bureau Mutual Ins. Co. v. Paschal*

Defendants argue, and the dissent agrees, that the outcome of this case is governed by and is virtually identical to the facts in *Paschal*, and coverage under Mary's policy should be extended to Jean and Marina. However, neither *Paschal* nor any other North Carolina case has extended coverage to individuals who had never resided in the policyholder's household. *See Paschal*, 231 N.C. App. 558, 752 S.E.2d 775. Based upon an "individualized and fact-specific [review]," *Id.* at 565, 752 S.E.2d at 780, of the facts of this case, we reject Defendants' argument.

This Court determined in *Paschal* that a minor granddaughter was a resident of her grandfather's household, and thus, an insured for the purposes of an automobile insurance policy. There, a sixteen-year-old minor child was injured while riding in a car driven by her cousin. *Id.* at 559, 752 S.E.2d at 776. The minor child brought suit against Farm Bureau, claiming that she was covered under her grandfather's insurance policy. *Id.* The trial court granted summary judgment for Farm Bureau, but this Court looked expansively at the relationship between the policy holder and his granddaughter when it "interpreted" the policy. *Id.* at 568, 752 S.E.2d at 781-82.

The grandfather owned "multiple houses [on] several hundred acres of farmland," which he deemed a "family farm." *Id.* at 560, 752 S.E.2d at 777. The grandfather lived in one house, while the girl and her father lived in another house on the farm. *Id.* Multiple family members had lived and worked on the farm over the years, including the girl's father. All the bills, maintenance, and appliance costs, and mail associated with the girl's home was paid for by and sent to the grandfather at a single address. The girl's father never paid rent or expenses. *Id.*

The grandfather cared for and had become the legal guardian of his granddaughter when the girl's father was sentenced to prison for approximately a year. *Id.* When the girl was not living with her grandfather, the grandfather and the minor girl saw each other "almost every day," and the girl had keys to his multiple

structures on the farm and was "free to enter them any time." *Id.* at 561, 752 S.E.2d at 777. Upon these "individualized and fact-specific [facts]," *Id.* at 565, 752 S.E.2d at 780, this Court determined that the girl was entitled to coverage under the grandfather's policy because the grandfather was the minor's legal guardian, her *de facto* parent, "was the most constant caregiver," and "a regular participant in [the girl's] life." *Id.* at 568, 752 S.E.2d at 781. The grandfather frequently took the girl to her scheduled appointments and paid the "vast majority of [the girl]'s expenses," including all her basic necessities such as food and clothing. *Id.*

The analysis and determination in *Paschal* was grounded largely in the specific facts of the grandfather's particular and pervasive involvement in the girl's life in the absence of her father, and not due solely to the physical facts of her residence, which included intermittent periods of cohabitation under the same roof. This Court in *Paschal* did not establish a new "most constant caregiver" standard. It was "in light of [*Paschal*'s] very particular circumstances" that the minor child was deemed a resident of the grandfather's household and entitled to coverage. *Id.* at 568, 752 S.E.2d at 782.

The holding in *Paschal* is an application of prior precedent that whether a person is a resident of an insured's household is an "individualized and fact-specific" inquiry. *Id.* at 565, 752 S.E.2d at 780. Here, the facts are not in dispute. The trial court properly concluded that neither Jean nor Marina had ever lived with Mary, and

no evidence tends to show Mary had ever supplanted either her son, David or his wife, Jean, as Marina's "most constant caregiver," *Id.* at 568, 752 S.E.2d at 776, so as to bring this case under the very narrow purview of *Paschal*. Defendant's arguments are overruled.

### Conclusion

Jean and Marina never lived with Mary in her house. They do not qualify as "insureds" under the plain meaning of the Farm Bureau policy because they are not "family members" of Mary who were "residents of her household" at the time of the accident. Defendants have failed to show reversible error in the trial court's judgment. Accordingly, we affirm the trial court's entry of summary judgment.

AFFIRMED.

Judge TYSON concurs.

Judge INMAN dissents with separate opinion.

No. COA18-328 – *N.C. Farm Bureau Mut. Ins. Co. v. Martin*

INMAN, Judge, dissenting.

Because the majority opinion violates binding precedent, I respectfully dissent.

> When an insurance company, in drafting its policy of insurance, uses a "slippery" word to mark out and designate those who are insured by the policy, it is not the function of the court to sprinkle sand upon the ice by strict construction of the term. All who may, by any reasonable construction of the word, be included within the coverage afforded by the policy should be given its protection. If, in the application of this principle of construction, the limits of coverage slide across the slippery area and the company falls into a coverage somewhat more extensive than it contemplated, the fault lies in its own selection of the words by which it chose to be bound.

*Jamestown Mut. Ins. Co. v. Nationwide Mut. Ins. Co.*, 266 N.C. 430, 437-38, 146 S.E.2d 410, 416 (1966).

North Carolina's appellate courts have for decades held that the terms "resident" and "household" as used in insurance policies to define who is insured "should be given the *broadest construction . . . by any reasonable construction*" possible. *Great Am. Ins. Co. v. Allstate Ins. Co.*, 78 N.C. App. 653, 656, 338 S.E.2d 145, 147 (1986) (citations omitted) (emphasis added). This rule is consistent with the canon of construction that ambiguous terms in a contract should be construed against the drafter of a contract—in the case of insurance policies, the insurer. *Jamestown*, 266 N.C. at 437-38, 146 S.E.2d at 416.

Our Supreme Court has explained the reason for this canon in the insurance context:

> Policies of insurance differ somewhat from other contracts, however, in respect to the rules of construction to be applied to them. They are unipartite. They are in the form of receipts from insurers to the insured, embodying covenants to compensate for losses described. They are signed by the insurer only. In general, the insured never sees the policy until after he contracts and pays his premium, and he then most frequently receives it from a distance when it is too late for him to obtain explanations or modifications of the policy sent him. The policy, too, is generally filled with conditions inserted by persons skilled in the learning of the insurance law and acting in the exclusive interest of the insurance company. Out of these circumstances the principle has grown up in the courts that these policies must be construed liberally in respect to the persons insured, and strictly with respect to the insurance company.

*Barker v. Iowa Mut. Ins. Co.*, 241 N.C. 397, 400, 85 S.E.2d 305, 307 (1955) (quoting *Union Mut. Life Ins. Co. v. Wilkinson*, 80 U.S. 222, 232, 20 L. Ed. 617 (1871)).

The interpretation of the term "resident" in insurance policies "has been the subject of numerous appellate court decisions." *Great American*, 78 N.C. App. at 655-56, 338 S.E.2d at 147 (citations omitted). "It is difficult to give an exact or even satisfactory definition of the term 'resident,' as the term is flexible, elastic, slippery and somewhat ambiguous." *Id.* at 656, 338 S.E.2d at 147. The term "resident," if not defined in the insurance policy, "is capable of more than one definition *and is to be construed in favor of coverage.*" *Fonvielle v. S.C. Ins. Co.*, 36 N.C. App. 495, 497, 244 S.E.2d 736, 738 (1978) (citing *Jamestown*, 266 N.C. at 437-38, 146 S.E.2d at 416)

(emphasis added).

This Court has recognized two categories of insurance policies defining an insured's covered family members: "those involving clauses that exclude from coverage members of the insured's household, and those that extend coverage to such persons." *Davis v. Md. Cas. Co.*, 76 N.C. App. 102, 105, 331 S.E.2d 744, 746 (1985). Clauses excluding coverage are "restrictively defined," while clauses that invite or extend coverage are to be "broadly interpreted" and "*members of a family need not actually reside under a common roof to be deemed part of the same household.*" *Id.* (emphasis added). Both adults and minors may be "resident[s] of more than one household for insurance purposes." *Id.* at 106, 331 S.E.2d at 746. In *Davis*, as in this case, the insurance policy extended coverage to any "family member" of the policyholder.

Mary's insurance policy, like the policies at issue in *Jamestown*, *Fonvielle*, *Great American*, and *Davis*, includes a clause that extends coverage to family members residing in her household. Specifically, the policy defines as "the Insured" Mary "or any family member" of Mary, and further defines a "family member" as "a person related to you by blood, marriage or adoption who is a resident of your household."

Because Mary's policy extends coverage to her family members, its definition of that term, including the clause "resident of your household," "should be given the broadest construction[,] and that all who may be included, by any reasonable

3

construction of [it], within the coverage of an insurance policy using such [a term], should be given its protection." *Great American*, 78 N.C. App. at 656, 338 S.E.2d at 147.

The majority criticizes this Court's interpretations of the term "resident" in prior insurance coverage decisions, analogizing them to a "snapped rubber band" stretched beyond its "defined and rational limits." But the fundamental doctrine requiring us to follow precedent provides no exception for decisions we view as irrational. "[A] panel of the Court of Appeals is bound by a prior decision of another panel of the same court addressing the same question, but in a different case, unless overturned by an intervening decision from a higher court." *In re Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989). Our Supreme Court has not overturned this Court's holdings in *Fonvielle*, *Great American*, or *Davis*. Nor has our Supreme Court overturned its own decisions in *Jamestown* and *Barker*.

The majority declares that the term "resident" as used in Mary's policy is plain enough to cast aside the tools of construction mandated by *Jamestown*, *Fonvielle*, *Great American*, and *Davis*. No matter how sharply the majority disagrees with prior decisions extending the meaning of "resident" to afford insurance coverage to extended family members of a policyholder, absent direction by our Supreme Court, we are bound by them.

The majority also discounts this Court's prior decisions as "gerrymandered and stretched interpretations" of the term "resident" in insurance policies. It then

4

summarily declares that the "plain language of Mary's policy restricts and limits coverage" because it "unambiguously" defines Mary's family members as "resident[s] of [Mary's] household." This is the very same language that a half century of precedent has held to be ambiguous, requiring a broad interpretation of this policy language. *Jamestown,* 266 N.C. at 437-38, 146 S.E.2d at 416; *Fonvielle,* 36 N.C. App. at 497, 244 S.E.2d at 738; *Great American,* 78 N.C. App. at 656, 338 S.E.2d at 147; *Davis,* 76 N.C. App. at 104-05, 331 S.E.2d at 745-46. Indeed, in this case, a representative for Farm Bureau testified at a deposition that he was not sure when Farm Bureau's auto policy was last updated or changed.

The majority's assertion that "the plain meaning of the term 'household' is limited to a single structure" conflicts with the rule that a family member can be a resident of multiple households, which, by extension, logically means that one need not reside in the same dwelling as the insured to be covered. *See Davis*, 76 N.C. App. at 105, 331 S.E.2d at 746 ("[M]embers of a family need not actually reside under a common roof to be deemed part of the same household."); *N.C. Farm Bureau Mut. Ins. Co. v. Paschal*, 231 N.C. App. 558, 565, 752 S.E.2d 775, 780 (2014) (same (quoting *Davis*, 76 N.C. App. at 105, 331 S.E.2d at 746)); *N.C. Farm Bureau Mut. Ins. Co. v. Lowe*, 180 N.C. App. 215, 219, 636 S.E.2d 207, 209 (2006) ("[I]t is generally recognized that a person may be a resident of more than one household for insurance purposes."

(quoting *Davis*, 76 N.C. App. at 106, 331 S.E.2d at 746)).[1]  In lieu of this precedent, the majority relies on multiple dictionaries to narrowly define the term "household" as persons who live in a single house or dwelling, and then declares that Jean and Marina cannot be considered members of Mary's household because they never lived in her house.

The majority's analysis exceeds the authority of this Court.  "This Court is an error-correcting court, not a law-making court." *Shera v. N.C. State Univ. Veterinary Teaching Hosp.*, 219 N.C. App. 117, 127, 723 S.E.2d 352, 358 (2012). Only our Supreme Court can change the law in this manner.

The majority also reasons that this case is distinguishable from this Court's decision in *North Carolina Farm Bureau Mutual Insurance Co. v. Paschal*, 231 N.C. App. 558, 752 S.E.2d 775 (2014), and therefore requires a different result.  In *Paschal*, sixteen-year-old Harley was injured while riding in a car driven by her cousin.  *Id.* at 559, 752 S.E.2d at 776.  She claimed coverage under an auto insurance policy held by her grandfather, who owned a family farm where Harley resided, and whose automobile insurance provided coverage for "resident[s] of [the grandfather's] household." *Id.* at 564, 752 S.E.2d at 779.

---

[1] *Lowe* reversed the trial court's order granting summary judgment in favor of a tortfeasor who claimed liability coverage under her parents' homeowner's policy, even though she had moved in with her boyfriend.  *Id.* at 220, 636 S.E.2d at 210.  This Court, reviewing the evidence in the light most favorable to the non-moving party (the insurance company), held that a genuine issue of material fact existed regarding whether the tortfeasor was a resident of her parents' household and remanded the matter for trial.  *Id.* at 219-20, 636 S.E.2d at 209-10.  In this case, the parties filed cross motions for summary judgment and neither contends that a genuine issue of disputed fact must be resolved by a jury.

Harley's grandfather, like Mary, "owned multiple houses [on] several hundred acres of farmland," which he called a "family farm." *Id.* at 560, 752 S.E.2d at 777. He lived in one house while Harley and her father lived in another house on the farm. *Id.* Multiple family members lived and worked on the farm; all the bills, maintenance costs, and appliance costs were paid for by her grandfather; and Harley's grandfather did not charge them rent. *Id.* "When Harley could not stay with [her father] due to [his] legal problems, she stayed with [her grandfather], at" two of her grandfather's houses. *Id.* For a period of about one year a few years before the accident, when Harley's father was in prison, her grandfather cared for her and temporarily became her legal guardian. *Id.* at 568, 752 S.E.2d at 781-82. We held that the evidence showed Harley's grandfather "was the most constant caregiver" and "a regular participant in Harley's life." *Id.* at 568, 752 S.E.2d at 781. Coupled with the fact that both Harley and her grandfather considered themselves part of the same household, we concluded that Harley was a "family member" as defined by her grandfather's insurance policy. *Id.* at 568, 752 S.E.2d at 781-82.

The majority asserts that "neither *Paschal* nor any other North Carolina case has extended coverage" to a family member who never resided in the policyholder's house. It may be true that no reported case has extended coverage in this manner, but this Court's unpublished opinion in *Integon National Insurance Co. v. Mooring*, No. COA14–1303, 2015 WL 2062042 (N.C. Ct. App. May 5, 2015), refutes the majority's assertion. We held in *Integon* that "*[e]ven though [the appellee] lived under*

7

*a separate roof owned by [the insured]*," she was dependent enough on the insured to be a resident of the insured's household. *Id.* at \*5; *see also id.* at \*4 ("[M]embers of a family need not actually reside under a common roof to be deemed part of the same household." (quoting *Paschal*, 231 N.C. App. at 567, 752 S.E.2d at 780)). It is also worth noting that, at the time of the accident in *Paschal*, Harley's grandfather was not her legal guardian nor was Harley residing in any of the houses her grandfather lived in. *Paschal*, 231 N.C. App. at 568, 752 S.E.2d at 781-82.

The majority reasons that *Paschal* was "grounded largely in the specific facts" of the insured grandfather's "particular and pervasive involvement in the girl's life in the absence of her father," and was not "solely" based on the "physical facts of her residence." Of course, it is unlikely that any fact-specific analysis relies on a single factor. The "rest of the story" in *Paschal* that the majority omits to mention reflects similarities to this case:

> Thurman owned the Branson house where Harley was living at the time of the accident. Thurman did not charge any rent for Reggie, Harley, or her brothers to live there. Thurman had a key to the Branson house, and freely entered it whenever he desired. Thurman paid the utility bills for the Branson house, and bought appliances for the house as needed. The Branson house and the Brush Creek house were connected to each other by contiguous land owned by Thurman. Thurman considered these two houses to be part of his farm, which he considered to be a family farm. To this extent, Harley and Thurman could both be considered residents of Thurman's "family farm." Thurman spent much of his time at the Brush Creek house, and had most of his mail, including important documents, delivered to that address.

*Paschal*, 231 N.C. App. at 568, 752 S.E.2d at 781. This Court's analysis in *Paschal* emphasizes not only the policyholder's role as caregiver for his granddaughter, but also his responsibility for the other house on his farm, where his granddaughter resided.

Jean and Marina lived in one of two houses on the farm, for which Mary charged them no rent. All family members had keys to both houses with unrestricted access, and Jean and Marina had their mail delivered to Mary's house. Mary supported her family members financially, interacted with them almost every day, and considered them a part of her own household.

Martin Farm also only received income during the harvest season and the Martins only worked on Martin Farm during that timeframe without any other means of income, relying on food stamps outside of the working season. Although Mary paid the Martins wages, the Martins' income was conditioned on the profitability of Martin Farm. Mary would only pay them wages if Martin Farm accumulated enough profit and, if Martin Farm's revenue stream fell short, Mary would resort to her personal bank account to pay the necessary expenses.[2] All the while, Mary paid the insurance premiums for both Farm Bureau policies, paid all

---

[2] The record shows that Mary tried to bifurcate her business and personal expenses by creating two bank accounts. But, because Martin Farm's income was sporadic and inconsistent, Mary commonly utilized both accounts to pay for various expenditures.

costs associated with the guest house, and allowed Marina and Jean, and David, to live there rent-free.

All of Marina's and Jean's "personal expenses" were paid with funds provided by Mary, whether from her business or personal account. The Martins derived their entire income from Mary and relied on her for shelter and financial support, while Mary relied on them for labor and, regardless of Martin Farm's economic status, perpetually allowed the Martins to reside on Martin Farm at no cost. Adding to these facts, the "evidence discloses that there existed between [Mary] and [Marina and Jean] a continuing and substantially integrated family relationship." *Davis*, 76 N.C. App. at 106, 331 S.E.2d at 747.

The majority concludes that "neither Jean nor Marina had ever lived with Mary, and no evidence tends to show Mary ever had supplanted" David or Jean as "Marina's 'most constant caregiver,' so as to bring this case under the very narrow purview of *Paschal*." The majority's reasoning seems to contradict its assertion that "[t]his Court in *Paschal* did not establish a new 'most constant caregiver' standard." In any event, as discussed above, *Paschal* is hardly the only precedent requiring a broader interpretation of the term "family member" in the insurance contract at issue here. *See, e.g.*, *Davis*, 76 N.C. App. at 105, 331 S.E.2d at 746.

Finally, the undisputed testimony by Mary and the Martins that they considered themselves residents of the same household is evidence that this Court and our Supreme Court have held is an important factor to consider when

10

determining residency for insurance coverage purposes. *See Fonvielle*, 36 N.C. App. at 498, 244 S.E.2d at 738 ("Intent to remain at a place seems determinative, although not intent to remain permanently."); *see also Great American*, 78 N.C. App. at 656, 338 S.E.2d at 147 ("[T]he intent of that person is material to the question[.]"); *Paschal*, 231 N.C. App. at 565, 752 S.E.2d at 780 ("Not only are relevant facts considered in [determining whether a person is a resident of someone's household], but intent, as well[.]" (citing *Great American*, 78 N.C. App. at 656, 338 S.E.2d at 147)).

For the reasons explained above, and because all parties have stipulated that no material facts are in dispute, I would reverse the trial court's order entering summary judgment in favor of Farm Bureau and remand for the trial court to enter summary judgment in favor of Marina and Jean.