IN THE SUPREME COURT OF NORTH CAROLINA

No. 391A19

Filed 18 December 2020

NORTH CAROLINA FARM BUREAU MUTUAL INSURANCE COMPANY, INC.

v.

MARINA MARTIN, by and through her natural parent and guardian JEAN O. MARTIN, JEAN O. MARTIN, individually, and DAVID M. MARTIN

Appeal pursuant to N.C.G.S. § 7A-30(2) from a divided decision of the Court of Appeals, 833 S.E.2d 183 (N.C. Ct. App. 2019), affirming an order entered on 28 September 2017 by Judge J. Carlton Cole in Superior Court, Currituck County. Heard in the Supreme Court on 15 June 2020.

*Breit Cantor Grana Buckner, PLLC, by Jeffrey A. Breit, for defendant-appellants.*

*Young, Moore, and Henderson, P.A., by Walter E. Brock, Jr., Andrew P. Flynt, and Matthew C. Burke, for plaintiff-appellee.*

*Pinto Coates Kyre & Bowers, PLLC, by Jon Ward and Paul D. Coates, and Ann C. Ochsner, for amicus curiae North Carolina Advocates for Justice.*

*George L. Simpson, IV, for amicus curiae North Carolina Association of Defense Attorneys.*

DAVIS, Justice.

In this case, we must determine whether defendants are afforded underinsured motorist and medical payments coverage under an insurance policy issued by the plaintiff insurance company to a family member. Because we conclude the trial court

properly determined that defendants are not entitled to coverage under the policy, we affirm the decision of the Court of Appeals.

**Factual and Procedural Background**

This case arises from a car accident that occurred in Virginia Beach, Virginia, involving defendants Jean Martin (Jean) and Marina Martin (Marina). Marina is the teenage daughter of Jean and David Martin (David). On 6 January 2014, Jean was driving her 1994 Ford automobile with Marina in the passenger seat. Jean was crossing a four-way intersection when a vehicle driven by a third party, Santiago Livara, struck her car. Jean and Marina were both injured in the collision.

Jean and Marina subsequently sued Livara for negligence in the Virginia Beach Circuit Court. The parties eventually reached a settlement in which Livara's liability insurer paid its maximum liability coverage limits in the amount of $25,000 to both Jean and Marina.

Jean and Marina also sought additional coverage under two different automobile insurance policies issued by plaintiff North Carolina Farm Bureau Mutual Insurance Company, Inc. (Farm Bureau) to members of the Martin family. The first policy bore policy number APM-3887419 and was issued by Farm Bureau to David and Jean for the coverage period of 19 October 2013 to 19 February 2014. This policy identified David and Jean as the named insureds and listed three covered vehicles, including the Ford automobile that Jean was driving at the time of the accident. The policy provided medical payments coverage of up to $1,000 per person and uninsured/underinsured motorist coverage of up to $50,000 per person/$100,000

per accident. Because Jean and Marina both qualified as "insureds" under this policy, Farm Bureau paid the applicable policy limits of $1,000 each to Jean and Marina under the medical payments coverage and $25,000 each to Jean and Marina under the underinsured motorist coverage.

In addition, Jean and Marina asserted that they were also entitled to medical payments and underinsured motorist coverage under a second Farm Bureau policy. This second policy (the Policy) is the subject of this appeal and bore policy number APM-3482146. The Policy was issued by Farm Bureau to Mary Martin (Mary), who is the mother of David and the paternal grandmother of Marina. The Policy was issued for the period encompassing 13 October 2013 to 13 April 2014. The Policy designated Mary as the named insured, identified two covered drivers (Mary and her late husband William), and listed one covered vehicle.[1] The Policy provided medical payments coverage of up to $1,000 per person and uninsured/underinsured motorist coverage of up to $100,000 per person/$300,000 per accident. The Policy contained the following provisions that are relevant to this appeal:

---

**DEFINITIONS**

---

Throughout this policy, "you" and "your" refer to:
1. The "named insured" shown in the Declarations; and
2. The spouse if a resident of the same household.

---

[1] The vehicle driven by Jean at the time of the 6 January 2014 accident was not identified as a covered vehicle under Mary's policy.

. . . .

"Family member" means a person related to you by blood, marriage, or adoption who is a resident of your household. This includes a ward or foster child.

. . . .

## PART B — MEDICAL PAYMENTS COVERAGE

**INSURING AGREEMENT**

We will pay reasonable expenses incurred for necessary medical and funeral services because of bodily injury:

1. Caused by accident; and

2. Sustained by an insured.

. . . .

"Insured" as used in this Part means:

1. You or any family member;

      a. while occupying; or

      b. as a pedestrian when struck by;

      a motor vehicle designed for use mainly on public roads or a trailer of any type.

. . . .

## PART C2—COMBINED UNINSURED/UNDERINSURED MOTORISTS COVERAGE

**INSURING AGREEMENT**

We will pay compensatory damages which an insured is legally entitled to recover from the owner or operator of an uninsured motor vehicle because of:

1. Bodily injury sustained by an insured and caused by an accident; . . .

. . . .

> We will also pay compensatory damage which an insured is legally entitled to recover from the owner or operator of an underinsured motor vehicle because of bodily injury sustained by an insured and caused by an accident.
>
> . . . .
>
> Insured as used in this Part means:
>
> 1. You or any family member.
>
> . . . .

Jean and Marina asserted that they were covered under the Policy because they were "family members" of Mary Martin—that is, they were related to Mary and were "residents" of her "household." Farm Bureau disputed coverage and filed a declaratory judgment action on 13 April 2015 in Superior Court, Wake County, against Marina, Jean, and David (defendants) seeking a declaration that they were not entitled to coverage under Mary's policy because they were not "residents" of Mary's "household" at the time of the accident. On 16 March 2016, defendants filed a motion for summary judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure. On 20 April 2016, a consent order was entered transferring the case to Superior Court, Currituck County. Farm Bureau filed a cross-motion for summary judgment on 19 May 2017.

The evidence before the trial court at the summary judgment stage did not contain any material factual disputes. On the date of the accident, Mary was the sole owner of the Martin Farm, a 76-acre property located on Knotts Island, North Carolina, that contained two separate houses located on the property. At all relevant times, Mary lived in the "main house" on the farm, while defendants lived in a

separate "guest house" that was also situated on the farm. Both residences were owned by Mary, and Mary never charged defendants rent to live in the guest house.

The houses shared a single driveway but were both stand-alone structures located approximately 100 feet from one another. Each residence was visible from the other, and it took approximately 3-5 minutes to walk between them. The houses had different street addresses. Mary's home was located at 213 Martin Farm Lane, while the address of defendants' residence was 224 Bay Orchard Lane. Defendants and Mary maintained separate post office boxes for the receipt of mail, but packages for both defendants and Mary were delivered to Mary's house. With the exception of occasional overnight stays (such as when a power outage occurred at one of the two houses), defendants and Mary lived separately in their respective homes at all relevant time periods.

Defendants visited with Mary almost every day, ate meals together, and performed chores for each other. Defendants possessed keys to Mary's house and were granted unlimited access to enter her residence. Mary had the same right of access to defendants' house. At all relevant times, David and Jean worked on the Martin Farm, managing the crops and the winery. David and Jean, in turn, received a weekly salary—contingent upon there being sufficient funds available in the farm's bank account after all farm-related bills were paid.

The Martin Farm was operated as a limited liability company (LLC). Mary maintained a business checking account in the name of the LLC, which she used to pay most of the bills for the farm. The salaries of Jean and David were paid by the

LLC. The utility bills and property taxes for both houses as well as the cost of repairs for both residences were also paid by the LLC. Additionally, the LLC paid for some of the personal expenses of defendants, including their gas, internet, and cell phone bills. However, defendants paid for their remaining personal expenses such as life insurance, groceries, cable, and clothing.

Beginning in 2013—approximately a year before the accident—Mary began staying for extended periods of time with her son Wayne in Virginia Beach while she received medical treatment for cancer. As Mary's health worsened, she was increasingly unable to travel back and forth between North Carolina and Virginia and had to remain primarily at Wayne's house in Virginia Beach. At that point, she started having all of her personal mail sent to Wayne's house—although farm-related mail was still sent to her North Carolina home.

A hearing was held on the parties' summary judgment motions on 21 August 2017. On 28 September 2017, the trial court entered summary judgment in favor of Farm Bureau after concluding as a matter of law that defendants were not entitled to coverage under the Policy.

Defendants appealed to the Court of Appeals, which affirmed the trial court's order in a divided decision. In its opinion, the Court of Appeals majority concluded that defendants did not qualify as "residents" of Mary's "household" and, accordingly, were not covered under the Policy. Judge Inman dissented, stating her belief that defendants and Mary were all part of the same household and asserting that the majority's opinion conflicted with the Court of Appeals' prior decision in *N.C. Farm*

*Bureau Mut. Ins. Co v. Paschal*, 231 N.C. App. 558 (2014). On 8 October 2019, defendants filed a notice of appeal with this Court based upon the dissent.

**Analysis**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2019). "A ruling on a motion for summary judgment must consider the evidence in the light most favorable to the non-movant, drawing all inferences in the non-movant's favor." *Morrell v. Hardin Creek, Inc.*, 371 N.C. 672, 680 (2018). We review de novo an appeal of a summary judgment order. *In re Will of Jones*, 362 N.C. 569, 573, 669 (2008).

This Court has held that a dispute regarding coverage under an insurance policy is appropriate for resolution by summary judgment where the material facts and the relevant language of the policy are not in dispute and the sole point of contention is "whether events as alleged in the pleadings and papers before the court are covered by the policies." *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 690–91 (1986). The party seeking coverage under an insurance policy bears the burden "to allege and prove coverage." *Brevard v. State Farm Mut. Auto. Ins. Co.*, 262 N.C. 458, 461 (1964).

The parties here do not dispute either the material facts of the case or the pertinent language of the Policy. Therefore, we agree that this case was appropriate for resolution by summary judgment.

Our interpretation of an insurance policy is based on the fundamental principle that the plain language of the policy controls. *Lunsford v. Mills*, 367 N.C. 618, 623 (2014). As we have previously explained, when interpreting an insurance policy

> the goal of construction is to arrive at the intent of the parties when the policy was issued. Where a policy defines a term, that definition is to be used. If no definition is given, nontechnical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning is intended. The various terms of the policy are to be harmoniously construed, and if possible, every word and every provision is to be given effect.

*Woods v. Nationwide Mut. Ins. Co.*, 295 N.C. 500, 505–06 (1978).

While it is true that ambiguities in the terms of an insurance policy must be construed against the insurer and in favor of coverage, this rule of construction is only triggered "when a provision in an insurance agreement is ambiguous." *Harleysville Mut. Ins. Co. v. Buzz Off Insect Shield, L.L.C.,* 364 N.C. 1, 10 (2010).

> To be ambiguous, the language of an insurance policy provision must, "in the opinion of the court, [be] fairly and reasonably susceptible to either of the constructions for which the parties contend." If the language is not "fairly and reasonably susceptible" to multiple constructions, then we "must enforce the contract as the parties have made it and may not, under the guise of interpreting an ambiguous provision, remake the contract and impose liability upon the company which it did not assume and for which the policyholder did not pay."

*Id*. (citations omitted)

The existence of an ambiguity "is not established by the mere fact that the plaintiff makes a claim based upon a construction of [the policy] language which the company asserts is not its meaning"—rather, an ambiguity exists only when the

language of the policy could reasonably support "either of the constructions for which the parties contend." *Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co.*, 276 N.C. 348, 354 (1970).

In accordance with these principles, we now turn to the language of the Policy. In order to receive coverage under the Policy, defendants must qualify as "insureds." The Policy defines an "insured," for purposes of both medical payments and underinsured motorist coverage, as "[y]ou or any family member." A "family member" is defined, in relevant part, as "a person related to you by blood, marriage, or adoption *who is a resident of your household.*" (emphasis added). The Policy does not, however, define the key terms "resident" or "household."

As an initial matter, it is undisputed that defendants were related to Mary "by blood, marriage, or adoption" as Marina was Mary's granddaughter and Jean was Mary's daughter-in-law. Thus, the sole remaining inquiry for this Court is whether defendants qualified as "residents" of Mary's "household."

In *Jamestown Mut. Ins. Co. v. Nationwide Mut. Ins. Co.*, 266 N.C. 430 (1966), we stated the following in interpreting a similar provision contained in an insurance policy:

> In the construction of contracts . . . words which are used in common, daily, nontechnical speech, should, in the absence of evidence of a contrary intent, be given the meaning which they have for laymen in such daily usage, rather than a restrictive meaning which they may have acquired in legal usage. In the construction of contracts the purpose is to find and give effect to the intention of the contracting parties, if possible. Thus the definition of 'resident' in the standard, nonlegal dictionaries may be a

more reliable guide to the construction of an insurance
contract than definitions found in law dictionaries.

*Id.* at 438.

It is therefore appropriate to begin our analysis by examining the definitions

of the terms "resident" and "household" as contained in non-legal dictionaries. The

Merriam-Webster Collegiate dictionary defines "resident" as "[o]ne who resides in a

place." *Resident*, Merriam-Webster Collegiate Dictionary (11th ed. 2007). "Reside" is

defined, in turn, as "[t]o dwell permanently or continuously." *Reside*, Merriam-

Webster Collegiate Dictionary (11th ed. 2007).

A "household" is defined as "[t]hose who dwell under the same roof and

compose a family" or, alternatively, "a social unit composed of those living together

in the same dwelling." *Household*, Merriam-Webster Collegiate Dictionary (11th ed.

2007). These definitions are largely mirrored by the American Heritage Dictionary,

which defines "reside" as "[t]o live in a place permanently or for an extended period"

and defines "household" as "[a] person or group of people occupying a single dwelling."

*Reside*, *Household*, The American Heritage Dictionary (4th ed. 2000).

Next, it is appropriate to examine those decisions from this Court in which we

have had occasion to construe these same policy terms or analogous ones. In doing so,

we acknowledge at the outset that this Court has struggled in attempting to

formulate a precise definition of the term "resident" in connection with an insurance

policy.

In *Barker v. Iowa Mut. Ins. Co.*, 241 N.C. 397 (1955), we considered whether a

college student who lived in an apartment near campus was still considered a resident of his father's household for purposes of a fire insurance policy issued to the father. *Id*. at 399. At the time the policy originally went into effect, the family had all lived together in a single dwelling in Sparta, North Carolina. However, the son left home at age 19 to attend college in Raleigh and thereafter lived near the campus in a rented apartment, which was paid for and furnished by his father. *Id*.

After the son's apartment burned down, the father's insurance company denied coverage, claiming that after the son moved out he was no longer covered under the policy. The policy provided coverage for "household and personal property . . . belonging to the insured or any member of the family of and residing with the insured." *Id*. The trial court ruled that coverage existed, and the insurance company appealed to this Court. *Id*. at 398.

We explained that the determinative question was "where the minor son had his residence at the time of the loss." *Id*. We observed that the term "[r]esidence has been variously defined by this Court" with definitions ranging from "a place of abode for more than a temporary period of time" to "a permanent and established home." *Id*. at 400. We focused our analysis on the question of whether a college student supported by his father who moves to an apartment "for the purpose of attending college classes become[s] a resident of the college community, or [whether] he retain[s] his residence with his father[.]" *Id*. at 399. We ruled that "[t]o say the son ceased to be a resident of Sparta and became a resident of Raleigh under the facts of this case would be giving the term 'residing with the insured' its most narrow and

restricted meaning." *Id.* Accordingly, we concluded that the son was a resident of his father's household at the time of the fire and was therefore covered under the father's insurance policy. *Id.* at 401.

In *Newcomb v. Great Am. Ins. Co.*, 260 N.C. 402 (1963), we addressed whether the plaintiffs, a husband and wife along with their infant daughter, should be considered "residents of the same household" as the wife's mother, Mrs. Gray, within the meaning of her insurance policy. Mrs. Gray was driving the plaintiffs' automobile with their daughter in the backseat when the vehicle ran off the road, killing their daughter. *Id.* at 402.

The evidence showed that after their marriage in 1957, the husband and wife had initially lived in Mrs. Gray's house for a year. *Id.* at 403. In 1958, they "renovated and furnished a house which belonged to Mrs. Gray and which was about one-quarter of a mile distance from Mrs. Gray's home." They lived there on their own until March 1959, at which time the death of a relative caused them to move back in with Mrs. Gray for several months. When the wife's brother, Bobby, came home from college in July 1959 to spend the summer with Mrs. Gray, the plaintiffs again "moved out of Mrs. Gray's home and into their own cottage" for approximately a month. After Bobby returned to college, the plaintiffs moved back into Mrs. Gray's house where they "slept, ate, lived, and stayed . . . up to the time of the accident, June 12, 1960." At all relevant times, "the plaintiffs' cottage ha[d] been kept clean and furnished and all utilities ha[d] been kept on and ready for habitation." The plaintiffs had planned to ultimately "remove themselves from Mrs. Gray's house and into their cottage" upon

Bobby's anticipated graduation from college in 1961. *Id*.

Based on these facts, we held that the plaintiffs were residents of the same household as Mrs. Gray. We explained our ruling as follows:

> While the word 'resident' has different shades of meaning depending upon context, we think it clear, under the stipulated facts, that plaintiffs, their infant daughter and Mrs. Gray were living together on June 12, 1960, as members of one household, and were then residents of the same household within the terms of the policy. Their status is determinable on the basis of conditions existing at the time the casualty occurred.

*Id*. at 405 (citations omitted).

This Court interpreted a similar insurance policy provision in *Jamestown*. The issue in that case was whether an adult son who had recently moved back into his father's home was a "resident of the same household" as his father. *Jamestown,* 266 N.C. at 431. The son had been involved in a car accident on 8 February 1963 and thereafter claimed that he was covered under his father's automobile insurance policy as "a relative of the Named Insured who is a resident of the same household." *Id*. at 432.

The record demonstrated that the father had lived at all relevant times in the same house in Rutherford County. *Id*. at 432. At the time of the accident, the son was "29 years of age, married but separated from his wife." *Id*. at 433. During his youth, the son had lived with his father until he turned 18, at which time he left home and moved to Virginia for work. He remained in Virginia for 14 months and then returned to his father's house, where he stayed for "several months until his marriage, when

he left again." He then enlisted in the army, and for the next few years either lived with his wife in Spindale, North Carolina, or was stationed abroad. After he separated from his wife, he moved to Greenville, South Carolina, and stayed at a boarding house for approximately one year. Upon leaving Greenville, he went to work at a mill in Shelby, North Carolina, where he stayed at his sister's home for several months. *Id.* He was then transferred to a different position at the mill, which made transportation "more convenient[] if he stayed at his father's home." As a result, "he left his sister's home and returned to the home of his father, intending ultimately to find a boarding house in Shelby and get a room there." *Id.*

At the time of the accident, the son had been staying at his father's home for approximately two weeks. *Id.* at 433. The evidence showed that (1) he "did not intend to stay there permanently but he had no fixed plan as to when he would leave;" (2) he "had found a boarding house in Shelby but had not [yet] moved to it;" (3) he "had no home of his own and no furniture" and his "only belongings were his clothes;" and (4) he considered his father's home "the only permanent place that he had to go back to." During this time spent at his father's house, he ate meals together with his father, paid nothing for room and board, occasionally drove his father's car, and used his father's home address "as his permanent mailing address." He also "had the full use of the house and slept in the room which he had used when he was growing up." *Id.* In analyzing the policy, we recognized that

> [t]he words 'resident,' 'residing,' and 'residence' are in common usage and are found frequently in statutes, contracts and other documents of a legal or business

nature. They have, however, no precise, technical and fixed meaning applicable to all cases.

*Id.* at 435.

We ultimately concluded that the son was a resident of his father's household for purposes of the policy. *Id.* at 439. We found it dispositive that (1) the son "had no home of his own;" (2) he "carr[ied] with him all his possessions" when he returned to his father's house; (3) he intended to "remain there until living quarters more convenient to his employment could be found;" (4) while at his father's house, he "lived in and used his father's house as he had done when a boy" by eating, sleeping, and doing laundry there; and (5) the son paid no rent to his father. Based on these factors, we stated the following:

> We think it is clear that under these circumstances [the son] was 'a resident of the same household' as his father. He is not in the same position as an adult child having a home of his own to which he intends to return and is making a mere visit to his parents. Nor is he in the position of a mere roomer or boarder. He was there because he was a member of the family and had no other home.

*Id.*

These cases aptly demonstrate that the question of who is considered to be a resident of a household can require a particularized, fact-intensive inquiry into the circumstances of the parties' current and prior living arrangements. Nevertheless, our prior decisions do make clear that one basic prerequisite exists when a party seeks coverage under this type of provision contained within a relative's insurance policy—namely, the party must show that they actually lived in the same dwelling as

the insured relative for a meaningful period of time. The son in *Barker* lived with his father before leaving for college at age 19. The husband and wife in *Newcomb* had lived with Mrs. Gray off and on for at least three years. The son in *Jamestown* had lived with his father at periodic intervals for most of his adult life. Such a requirement is also fully in accord with the above-quoted dictionary definitions of the terms "resident" and "household."[2]

The dissent accuses us of "imposing [a] novel rule" by holding that family members must have actually lived together in order to be considered residents of the same household, apparently believing it is simply a coincidence that the families in *Barker, Newcomb*, and *Jamestown* had all lived under a common roof together for meaningful periods of time. This argument is patently incorrect. In each of these three cases, we would not have even considered the possibility that the persons seeking coverage were residents of the named insured's household had they not previously lived together in the same residence for a sufficient time period.[3] Given that the existence of such a threshold requirement is obvious, it is not surprising that this Court felt no need to state it outright. Instead, our prior decisions focused on the

---

[2] The dissent takes us to task for deeming relevant the dictionary definitions of the terms "resident" and "household." However, as noted earlier in our analysis, this Court in *Jamestown* expressly favored such an approach. *See Jamestown*, 266 N.C. at 438 ("Thus the definition of 'resident' in the standard, nonlegal dictionaries may be a more reliable guide to the construction of an insurance contract than definitions found in law dictionaries.").

[3] Although the dissent appears to view *Barker* as the controlling precedent on this subject, it conveniently ignores the fact that in *Barker*, as noted above, our opinion relied on the fact that the son had lived in the father's home—presumably for his entire life—prior to leaving for college.

question of whether the party seeking coverage had stayed in the insured family member's residence on more than merely a temporary basis and whether the facts supported a finding that the family members intended to form a common household.

Oddly, the dissent characterizes our decision as "results-driven." To the contrary, it is the dissent who engages in an analysis untethered by either the prior decisions of this Court or the plain meaning of the policy terms at issue in order to reach its preferred result. Indeed, the dissent advocates no actual standard at all— instead utilizing a vague and amorphous analysis that would presumably permit a finding of coverage any time a court feels such a result would be desirable. Such an approach finds no refuge in the prior decisions of this Court.

Under the facts of the present case, it is clear that defendants were not residents of Mary's household within the meaning of the Policy. The record unambiguously demonstrates that defendants have never actually lived in the same residence as Mary. Defendants lived in a house at 224 Bay Orchard Lane while Mary resided in a separate home at 213 Martin Farm Lane—the two residences being separated by a 3-5 minute walk. The houses had separate addresses and post office boxes. Although defendants and Mary would occasionally spend the night at each other's houses, they never actually lived together in one dwelling. Instead, they lived and slept primarily in their own homes and stored their clothing, furniture, and personal belongings in their own respective residences.

Defendants, however, ask us to apply a different test to determine whether they qualified as residents of Mary's household. In so doing, they rely heavily on the

analysis employed by the Court of Appeals in *N.C. Farm Bureau Mut. Ins. Co. v. Paschal*, 231 N.C. App. 558 (2014), the case serving as the basis for the dissent in the Court of Appeals in the present case.

In *Paschal* the minor plaintiff was injured in a car accident and sought coverage under her grandfather's automobile insurance policy, which provided coverage to "residents" of the insured's "household." *Id*. at 559. At the time of the accident, the grandfather owned a family farm that consisted of "multiple houses" on "several hundred acres of farmland." *Id*. at 560. For much of her childhood, the plaintiff lived with her father in one house on the farm, while the grandfather lived in his own residence. The houses were approximately one mile apart and were both located on a parcel of contiguous land owned by the grandfather. The grandfather's mail was sent to his own house, which was also where he kept the majority of his clothing. The grandfather spent most nights sleeping either at his own house or his girlfriend's house, but "on rare occasions" he would spend the night at the plaintiff's home. *Id*.

The grandfather testified that he considered the farm to be a "family farm" with his relatives living in various houses scattered across the property. The grandfather paid all of the bills associated with the plaintiff's house, including all taxes, utilities, and maintenance costs. *Id*. Because the plaintiff's father had "ongoing trouble with the law," she would stay in her grandfather's house "on occasion" when her father was away. *Id*. at 561. For example, in 2005 (prior to the accident at issue in *Paschal*) the plaintiff spent an entire year living with her grandfather while her

father was in prison, and the grandfather was also appointed her legal guardian during that time. The plaintiff was supported by her grandfather through " 'every bit' of her life, providing food, clothes, housing, utilities, phone, and other expenses" and taking her to any necessary medical appointments. Even when not living in the same house, they saw each other almost every day, and each of them was free to enter the other's house at any time. The grandfather testified that he considered the plaintiff and her father to be "a part of his household." *Id.*

Based on these facts, the Court of Appeals held that the plaintiff qualified as a resident of her grandfather's household under the policy. *Id.* The court explained its reasoning as follows:

> Determinations of whether a particular person is a resident of the household of a named insured are individualized and fact-specific . . . . [W]here members of an insured's household are provided coverage under the policy, "household" has been broadly interpreted, and *members of a family need not actually reside under a common roof to be deemed part of the same household* . . . . [I]n determining whether a person in a particular case is a resident of a particular household, the intent of that person is material to the question.

*Id.* at 565–66.

The Court of Appeals found it dispositive that (1) the grandfather "was the most constant caregiver in [plaintiff's] life;" (2) the grandfather "did not charge any rent" for the plaintiff and her father to live on his property; (3) the grandfather "paid for the vast majority of [her] expenses" such as food, clothing, and utilities; (4) the two houses were both located on the family farm and "connected to each other by contiguous land owned by [the grandfather];" (5) on several occasions during her

childhood, the plaintiff had lived with her grandfather while her father was away; and (6) both plaintiff and her grandfather considered themselves to belong to the same household. *Id*. at 568.

We need not determine whether the ultimate outcome in *Paschal* was correctly decided. Instead, we simply express our disapproval of the portions of the analysis in *Paschal* that are inconsistent with our holding in the present case—most notably, the proposition that relatives need not have *ever* actually lived in the same dwelling to be considered residents of the same household. Although there is no requirement that members of a family must have *continuously* resided under a common roof—without interruption—to be deemed residents of the same household, they must have done so for some meaningful length of time. The record must also reflect an intent to form a common household. But no matter how close or integrated the family relationship, family members who have never actually lived together in the same dwelling cannot be considered to be residents of a single household.

Alternatively, defendants and the *amici* suggest that *Paschal* established the existence of a "family farm exception," allowing family members who live near each other on a contiguous family farm to qualify as residents of a single household regardless of whether they have ever actually lived in the same dwelling. However, we are unable to discern any basis under this Court's prior case law for adopting a separate test for defining the policy terms "resident" and "household" that would

apply uniquely to persons living on "family farms."[4]

The dissent claims that we depart from a "settled rule" by disregarding the decision of the Court of Appeals in *Paschal*. This argument is incorrect for several reasons. Most basically, *Paschal* is clearly not a decision from this Court. We are, of course, not bound by any decision of the Court of Appeals. *See Misenheimer v. Burris*, 360 N.C. 620, 625 (2006) ("[D]ecisions of the Court of Appeals are clearly not binding on this Court."). Moreover, this Court has never even cited *Paschal*—much less stated our approval of the analysis contained therein. Finally, as stated above, we express no opinion on the question of whether the Court of Appeals reached the correct result in *Paschal*. Indeed, we note that the minor plaintiff in that case lived with her grandfather for a full year, whereas here it is clear that defendants and Mary never actually lived under the same roof.

The dissent resorts to hyperbole in accusing us of doing a "grave disservice to the people of this State" by failing to recognize a special rule for persons living on family farms, but fails to acknowledge that there is no precedent of this Court that would support the recognition of such an exception. Moreover, creating an exception out of whole cloth for residents of family farms would inevitably lead to arguments from litigants in future cases demanding that their unique living arrangements are similarly deserving of an exception to the general rule.

---

[4] Nor does the Policy itself recognize any exception to the terms of its coverage that would apply solely to family farms.

The dissent also attempts to manufacture an "urban versus rural" dynamic to our decision. Obviously, no such distinction exists. Rather, we are simply applying the longstanding and logical requirement that in order to be deemed residents of the same household, parties must have lived in the same dwelling for some meaningful period of time under circumstances demonstrating an intent to form a common household—regardless of where in this state they happen to live.

Because there is no dispute regarding any of the material facts of this case and the record clearly demonstrates that defendants and Mary never lived together under the same roof, defendants are unable to meet their burden of demonstrating that they were residents of Mary's household. Accordingly, we conclude that the Court of Appeals correctly determined that defendants are not entitled to coverage under the Policy and that the trial court appropriately awarded summary judgment in favor of Farm Bureau.

## Conclusion

For the reasons stated above, we affirm the decision of the Court of Appeals.

AFFIRMED.

Justice EARLS dissenting.

The sole issue in this case is whether, as a matter of law, the terms "resident" and "household" in Mary Martin's insurance policy were intended and understood by the contracting parties to include her daughter-in-law and her granddaughter, who lived on her farm. I believe that in defining these terms to exclude family members who live in separate dwellings on a single farm and concluding that Jean and Marina Martin were not residents of Mary's household, the majority imposes an unduly restrictive frame of reference that ignores the realities of rural life and fails to account for the full context of the lives the Martin's led on Mary's 76-acre farm on Knotts Island, North Carolina. Accordingly, I dissent from the majority's decision to construe "household" to deny the defendants coverage under the policy. Because I would hold that Mary Martin and the defendants were members of the same household, I would conclude that they are covered under the plain terms of the insurance policy issued to Mary, which covers all family members who were residents of the insured's household.

The crux of the issue for the majority is that Mary Martin lived in the main house on the farm and Jean and Marina lived in the guest house. According to the majority, because they do not now and have not previously lived together under a single roof, they cannot be members of one "household." As the cases cited by the majority illustrate, the question of whether family members are residents together in a single household is a highly fact-intensive inquiry that necessarily varies on a case-

by-case basis. *See Newcomb v. Great Am. Ins. Co.*, 260 N.C. 402, 405, 133 S.E.2d 3, 6 (1963) ("[T]he word 'resident' has different shades of meaning depending upon context."). Although we have looked to dictionaries in evaluating the meaning of a term used in an insurance contract, we have never held that the dictionary definition is dispositive. Instead, we have considered numerous factors relevant in ascertaining the meaning of the term as utilized in a particular contract, including the intent of the individuals claiming residence in a single household, the financial and familial relationships between them, and the "touchstone . . . that the phrase 'resident of the same household' has no absolute or precise meaning, and, if doubt exists as to the extent or fact of coverage, the language used in an insurance policy will be understood in its most inclusive sense." *Jamestown Mut. Ins. Co. v. Nationwide Mut. Ins. Co.*, 266 N.C. 430, 439, 146 S.E.2d 410, 417 (1966) (quoting *Am. Universal Ins. Co. v. Thompson*, 62 Wash. 2d 595, 599, 384 P.2d 367, 370 (1963)); *see also Great Am. Ins. Co. v. Allstate Ins. Co.*, 78 N.C. App. 653, 656, 338 S.E.2d 145, 147 (1986) ("Our courts have also found, however, that in determining whether a person in a particular case is a resident of a particular household, the intent of that person is material to the question.").

For example, we have previously held that a son who lives in an apartment near his college campus is still a member of his parent's household for insurance purposes, finding compelling the fact that the parent financially supported the son and paid for the apartment. *Barker v. Iowa Mut. Ins. Co.*, 241 N.C. 397, 85 S.E.2d 305

(1955). In reaching this conclusion in *Barker*, the Court emphasized that "[i]t must be remembered that the policy of insurance was written by the company's lawyers and that the courts must, therefore, in case of doubt or ambiguity as to its meaning, construe the policy strictly against the insurer and liberally in favor of the insured." *Id.* at 400, 85 S.E.2d at 307.

The facts of the present case should lead us to the same conclusion as we reached in *Barker*. Mary Martin paid the utility bills and property taxes for Jean and Marina's home, as well as bills for the replacement or repair of appliances, plumbing, and other infrastructure, from the farm account or, if there were insufficient funds, from her personal account. The family operated as a single, unified financial and family unit, with Mary Martin at the head. If it "would be giving to the term 'residing with the insured' its most narrow and restricted meaning" to hold that a father living in Sparta and a son living in Raleigh were not residents of the same household, *id.*, then certainly a mother and her daughter-in-law who live 100 yards from each other are residents of the same household, especially given the background presumption we apply in resolving ambiguous terms of an insurance contract. *See, e.g.*, *Silvers v. Horace Mann Ins. Co.*, 324 N.C. 289, 295, 378 S.E.2d 21, 25 (1989) ("Like all contracts, insurance contracts must be construed against the drafter, which had the best opportunity to protect its interests."); *Woods v. Nationwide Mut. Ins. Co.*, 295 N.C. 500, 506, 246 S.E.2d 773, 777 (1978) ("If, however, the meaning of words or the effect

of provisions is uncertain or capable of several reasonable interpretations, the doubts will be resolved against the insurance company and in favor of the policyholder.").

The majority attempts to distinguish away our precedents by imposing the novel rule that "no matter how close or integrated the family relationship, family members who have never actually lived together in the same dwelling cannot be considered to be residents of a single household."[1] The majority divines this supposed prerequisite from the fact that in *Barker*, *Newcomb*, and *Jamestown*, people who this Court deemed to be residents of a single household had also previously lived under a single roof. Although the majority does not dispute that none of our precedents ever expressly refer to this supposed prerequisite, the majority contends that this silence is unsurprising given that "the existence of such a threshold requirement is obvious." According to the majority, "we would not have even considered the possibility that the persons seeking coverage were residents of the named insured's household had they not previously lived together in the same residence for a sufficient time period." This reasoning elevates what our precedents establish as, at most, a factor to be considered in analyzing a term in an insurance contract into a dispositive prerequisite. Even if it were correct that this Court has (silently) "relied on the fact that [the party seeking coverage] had lived in the [insured party's] home," it is not at all obvious why that fact renders moot all the other factors we have previously relied

---

[1] The majority does not define the term "dwelling."

upon in assessing the meaning of the term "resident." In my view, the utterly unremarkable fact that in three cases people who this Court deemed to be residents of a single household had previously lived under a single roof does not establish that this Court has recognized "one basic prerequisite" to claiming coverage in an insurance contract. The majority points to no other context in which we have treated a factual circumstance common in a small number of our precedents as equivalent to the establishment of a binding legal rule.

The new prerequisite the majority recognizes is not found within the plain language of terms of the insurance policy at issue in this case, nor is it found in our precedents. Regardless, the majority's opinion does not negate the reality that in rural North Carolina, the type of living arrangement the Martins experienced at the time of the loss at issue in this case is common and commonly understood to be a family household. I am doubtful that the majority would apply the same stringent definition to living arrangements that are more common in urban parts of the state. If Jean and Marina lived in a semi-detached garage apartment on Mary's property, would they still be part of Mary's household?  What if they lived separately in both units of a duplex? Or what if Mary occupied an in-law suite complete with a kitchen, bath, and a separate living room, but which was physically contained within the same structure? No matter how the majority would interpret contracts applying to individuals in these hypothetical circumstances, the majority provides no convincing rationale for why that decision should turn entirely on whether or not the parties

previously lived together in a single physical structure. We should apply the same fact-intensive, contextual approach to resolve a claim arising from Knotts Island as we would to a claim arising from Raleigh. The majority does a grave disservice to the people of this State by failing to account for and give legal recognition to the residential patterns that so many families experience in rural areas.

The majority's treatment of *N.C. Farm Bureau Mut. Ins. Co. v. Paschal*, 231 N.C. App. 558, 752 S.E.2d 775 (2014) is particularly illustrative of its unwillingness to conduct the contextual analysis long held to be necessary in interpreting the meaning of a term in an insurance context. In *Paschal*, the Court of Appeals affirmed that in conducting the "individualized and fact-specific" inquiry which is necessary to determine "whether a particular person is a resident of the household of a named insured," it would follow the settled rule that " 'household' has been broadly interpreted, and *members of a family need not actually reside under a common roof to be deemed part of the same household." Id.* at 565, 752 S.E.2d at 780 (quoting *Davis v. Md. Cas. Co.*, 76 N.C. App. 102, 105, 331 S.E.2d 744, 746 (1985)). Of course, a decision of the Court of Appeals is not binding on this Court. But the Court of Appeals' decision gives ample reason to doubt that the "threshold requirement" the majority gleans from *Barker*, *Newcomb*, and *Jamestown* is as self-evidently "obvious" as the majority claims. In my view, *Paschal* accords with the two principles animating our jurisprudence in this domain: (1) courts should resolve disputes through a fact-intensive, contextual analysis, and (2) ambiguities should be resolved in favor of the

party claiming coverage. We should not ignore these principles on the basis of an observation about an unsurprising factual circumstance shared by three of our precedents and inconclusive dictionary definitions.

Although the majority's results-driven reasoning in this case fails to consider the realities of family life in rural North Carolina, its decision does not negate a court's responsibility to resolve disputes of this nature through "a particularized, fact-intensive inquiry into the circumstances of the parties' current and prior living arrangements." The majority does not explain why conducting this "particularized, fact-intensive inquiry" in a way that accounts for the lived realities of rural families would require "engag[ing] in an analysis untethered by either the prior decisions of this Court or the plain meaning of the policy terms at issue." Instead, such an approach is firmly consistent with our precedents, which have consistently avoided a one-size-fits-all rule in favor of an analysis that incorporates a variety of factors to account for the varying circumstances of households across our state. If that standard seems "vague and amorphous," it is because "[t]he words 'resident,' 'residing' and 'residence' . . . have, however, no precise, technical and fixed meaning applicable to all cases." *Jamestown*, 266 N.C. at 435, 146 S.E.2d at 414. In my view, the majority opinion relies upon an unduly rigid analysis instead of one that adequately considers relevant context and nuance, and in doing so disregards "the principle [which] has grown up in the courts that these policies must be construed liberally in respect to the persons insured, and strictly with respect to the insurance company." *Roberts v.*

*Am. All. Ins. Co.*, 212 N.C. 1, 192 S.E. 873, 876 (1937). Hopefully, future courts will analyze these contracts in a manner more consistent with the principles we have established in our previous cases, which this decision does not overrule. Because I believe the majority errs in denying coverage to Jean and Marina Martin, I respectfully dissent.